**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 12-cv-00048-WJM

NATIONAL SKI AREAS ASSOCIATION, INC.,

      Plaintiff,

v.

UNITED STATES FOREST SERVICE, an agency of the United States Department of
Agriculture,
UNITED STATES DEPARTMENT OF AGRICULTURE, and
HARRIS SHERMAN, Under Secretary for Natural Resources and Environment of United
States Department of Agriculture

      Defendants.

---

**ORDER**

---

## I. INTRODUCTION

This matter is before the Court on Plaintiff National Ski Areas Association, Inc.'s

("NSAA" or "Plaintiff") Amended Complaint ("Complaint").  (ECF No. 8.)  The Complaint

seeks judicial review of the March 6, 2012 directive (the "2012 Directive"), promulgated

by the United States Forest Service ("Forest Service" or "Defendants").[1]

The matter has been fully briefed (ECF Nos. 15, 37, 40), and Defendants have

submitted the administrative record to the Court (ECF Nos. 13, 14).  The Court also

heard arguments of counsel at a hearing on November 15, 2012.  Having reviewed the

briefs and the relevant materials from the record, the Court vacates the 2012 Directive

---

[1] While there are several Defendants involved in this matter, the primary Defendant is
the Forest Service. Depending context, the Court will either use Forest Service or Defendants.

and enters the limited injunctive relief described below.

## II. JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 1331 (federal

question), and 5 U.S.C. §§ 701–706 (the Administrative Procedure Act ("APA")).

## III. BACKGROUND[2]

### A.    Factual Background

The Defendant Forest Service authorizes ski areas to operate on National Forest

System lands pursuant to long-term special use permits ("Ski Area Permits").  These

permits are issued under federal law.  16 U.S.C. §§ 497, 497b, 497c.  Throughout the

United States, there are approximately 121 ski areas on National Forest System ("NFS")

lands.  (ECF No. 15-5 ¶ 2.)  These ski areas span 13 states.  (Id.)

This case involves Defendant's 2012 Directive—a water rights directive that is

inserted into Ski Area Permits when such permits are modified or terminated.  (AR

00524-26.)  Ski areas rely on water rights for snowmaking, domestic uses, and other

purposes.  (ECF No. 15-5 ¶ 5).  Snowmaking is critical to ski area operations. Most ski

areas could not operate in an economic or efficient manner without water rights for

snowmaking.  (AR 00147; ECF No. 15-5 ¶ 5.)

Forest Service Ski Area Permits do not confer water rights on the permit holder.

(AR 00018, 00658, 00664.)  Ski Area Permit holders must acquire water rights for use

---

[2] In reviewing the agency actions at issue, this Court is not to find facts per se, but must review the agency's decision in light of the administrative record relied on by the agency. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1564 (10th Cir. 1994).   The Court need only determine whether "substantial evidence" in the administrative record submitted by the agency supports the decision made.  *Id.* at 1575.  The Court notes in advance that it has exercised its discretion *not* to address Plaintiff's substantive claims. The administrative record here is limited (and relevant) only for the purposes of Plaintiff's procedural claims.

on NFS lands for snowmaking and other purposes under state law at their own expense.  (ECF No. 15-5  6-7; AR 00658, 00660, 00664.) Many ski areas on NFS lands have acquired water rights under state law for use in snowmaking and in other operations.  (AR 00141, 00234; ECF No. 15-5  ¶¶ 7-10.)[3]

The Forest Service issued special use permits for most ski areas nationwide in the 1960s and 1970s pursuant to Ski Area Permits that did not require ski areas to acquire water rights in the name of the United States.  (AR 00608-644.) Nor did these permits transfer water rights to the United States as a condition of the permit.  (*Id.*)

In 1982, Region 2 of the Forest Service—covering Colorado and Wyoming—adopted a Ski Area Permit clause that provided: "All water rights obtained for use on the area must be acquired in the name of the United States."  (AR 00125.) Region 2 of the Forest Service inserted this clause into some, but not all, Ski Area Permits.  (AR 00612-622, 531.)

In 1989, Region 2 adopted a new clause that provides: "All water rights acquired by the Holder during the term of this authorization which involve the diversion of water from National Forest System Lands, to the extent the same are applied to beneficial uses on National Forest System lands, shall be acquired in the name of or transferred to the United States.  Such transactions are subject to the holder's right of use."  (AR 00122 (the "Acquire and Transfer Clause")).  Again, Region 2 of the Forest Service inserted this clause into some, but not all, Ski Area Permits.  (AR 00612-622.)

---

[3] *See also,* Andrew M. Hensler Decl. ECF No.15, Exh. 7. Hensler states at paragraphs ¶¶ 4, 8: "Vail resorts has invested tens of millions of dollars and considerable effort. . . . in acquiring a portfolio of water rights in Colorado, Nevada and California. . . .These water rights are for both surface water, some of which originates on and is diverted from non-National Forest System land, and ground water obtained through wells drilled by Vail resorts."

In 1997, the Forest Service adopted its first national water rights clause, dubbed "X-99," which provides:  "All water rights obtained by the holder for use on the area authorized must be acquired in the name of the United States."  (AR 00071, 75, 79.) The Forest Service inserted this clause into some, but not all, Ski Area Permits.  (AR 00608-644.) The "X-99" clause was controversial.

In April 2002, the White River National Forest ("WRNF") in Colorado adopted the X-99 clause as a binding standard in its applicable Land and Resource Management Plan ("Forest Plan"), which would give the standard the full force and effect of law under the National Forest Management Act, 16 U.S.C. § 1604(i).  (Supp AR 000053.)  NSAA members administratively appealed the Forest Plan water standard on the grounds that it was an illegal uncompensated taking and was arbitrary and capricious.  (Supp AR 000028-38.)

In September 2004, the Chief of the Forest Service reversed the WRNF Forest Plan "X-99" standard, and directed the WRNF Forest Plan be amended to remove the water standard.  (Supp AR 000026-27.)  The Department of Agriculture affirmed the Chief's decision in December 2004.  (Supp AR 000012-25.)

The record shows that over three decades, the Forest Service did not follow a uniform policy, and did not require federal ownership of water rights in all Ski Area Permits.  (AR 00524-526, 531, 608-644.)  Lack of federal ownership is reflected by the many ski areas which obtained water rights without naming the United States as owner. (AR 00215-216, 00234.)

**B.     The 2004 Clause**

In response to the controversy over X-99 clause, the Forest Service consulted

with NSAA in 2003 and 2004 and adopted a new half-page water rights clause for Ski Area Permits (the "2004 Clause").  (AR 00068-70.)  The 2004 Clause provides: "[a]fter June 2004, any right to divert water from the permitted National Forest System land where the use of such water is on the same permitted National Forest System land shall be applied for and held in the name of the United States and holder."  (AR 00070.) Under the 2004 Clause, ski areas were free to keep existing water rights they had already acquired and perfected.  (AR 00070.)

The Forest Service invited ski areas on Forest Service lands nationwide to incorporate the 2004 Clause into their permits; thus replacing the unenforced prior clauses.  (AR 00255  ("The USFS will insert the new clause into existing 1986 Act special use permits upon request by a resort, and the clause will replace existing water clauses in those permits.").)  Approximately 79 NSAA ski areas on Forest Service lands have the 2004 Clause.  (AR 00526.)  Approximately 32 ski areas have Ski Area Permits that do *not* require any federal ownership of ski area water rights.  (AR 00524-526.)

## C.    The 2011 and 2012 Directives

On November 8, 2011, the Forest Service Associate Deputy Chief James M. Peña exercised delegated authority of the Chief of the Forest Service and issued the seven page Forest Service Interim Directive 2709.11-2011-3 ("2011 Directive").  (AR 00036-44.)  The 2011 Directive addressed ownership of water rights used within Ski Area Permit boundaries.  (AR 00036.)

Since the Forest Service issued the 2011 Directive on November 8, 2011, the Forest Service issued three ski area special use permits under the 1986 Ski Area

Permit Act[4] in connection with the sale and purchase of ski areas.  The Forest Service inserted the 2011 Directive language in the three Ski Area Permits without altering the terms of the 2011 Directive.  (ECF No. 15-5 ¶ 18; AR 00526.)

## D.    The 2012 Directive

The 2011 Directive was short-lived because, soon after NSAA filed this lawsuit seeking judicial review of the 2011 Directive, Associate Deputy Chief Peña replaced the 2011 Directive with Interim Directive Number 2709.11-2012-2 (the "2012 Directive"), effective March 6, 2012.  (AR 00024-32; ECF No. 53 Exh. 2.)  Plaintiff seeks judicial review of the 2012 Directive in this action.

Although the Forest Service made minor changes to the 2011 Directive, the 2012 Directive is substantively the same as the 2011 Directive.  (*Cf.* AR 00036-44 with AR 00024-32.)  The 2012 Directive provides that Forest Service employees must insert the 2012 Directive into ski area special use permits when the permits are reissued or modified.  (AR 00024-32; ECF No. 53 Exh. 2.)

Under the 2012 Directive, water rights are treated differently depending on where, when, and how they are acquired.  (AR 00024-32.)  Relevant clauses of the 2012 Directive that were directly in dispute between the parties can be found in ECF No. 53 Exh. 2.

Although the parties addressed many of the clauses in the 2012 Directive, it is worth summarizing some of the more pertinent clauses that are subject to the present dispute. For instance, paragraph F.2.d provides that when the permit is not

---

[4] This statute, among others, is purportedly relied upon to reflect government policy as to water rights and purportedly provides the Forest Service with power to promulgate and enforce specific clauses in the 2012 Directive.

reauthorized, the 2012 Directive forces permit holders to "transfer the holder's interest in water rights that are jointly owned. . . .to the United States." (AR 00031; ECF No. 15, Exh. 1 ¶ F.2.d.)

In paragraph F.2.e, the 2012 Directive provides that permit holder "grant" the United States a "limited power of attorney." (*Id.* Exh. 1 ¶ F.2.e.) This clause is designed so that the United States may "execute any document necessary to transfer water rights to the succeeding permit holder or the United States", or to "correct any failure to ensure that water rights [are] jointly held by the United States and the permit holder" (the "Power of Attorney Clause"). (AR 00031; ECF No. 15, Exh. 1 ¶ F.2.e.)[5]

The 2012 Directive further provides that: "The holder *waives* any claims against the United States for compensation for any water rights. . . that are transferred, removed, or relinquished as a result of revocation. . .of this permit" (the "Waiver Clause"). (AR 00031; ECF No. 15, Exh. 1 ¶ F.2.f.)[6]

---

[5] The Power of Attorney Clause expressly provides: "The holder and the holder's heirs and assigns shall execute and properly file any document necessary to transfer to a succeeding permit holder or the United States ownership of the holder's interest in...any water rights that are purchased or leased by the holder and that are changed or exchanged for diversion...or to correct a failure to ensure that any right to divert water...be held jointly by the United States and the holder as joint tenants with a right of survivorship or as tenants in common, in accordance with the terms of this permit. By executing this permit, the holder hereby grants limited power of attorney to the authorized officer to execute any document on behalf of the holder as may be necessary...in accordance with the terms of this permit." (AR 00031; ECF No. 15, Exh. 1 ¶ F.2.e.)

[6] The Waiver Clause expressly provides: "The holder waives any claims against the United States for compensation for any water rights . . .that are transferred, removed, or relinquished as a result of revocation or termination of this permit; for compensation in connection with imposition of any conditions on installation, operation, maintenance, and removal of water facilities associated with water rights. . . or for compensation in connection with imposition . . . transferring. . .any water rights subject to clauses XII.F.2.a through XII.F.2.c." (AR 00031; ECF No. 15, Exh. 1 ¶ F.2.f.)

**E.     The Status of Ski Area Permits Today**

There are approximately 121 Ski Area Permits in effect today.  (AR 00524.)  The record shows that the Forest Service has not enforced a consistent water rights policy with those 121 Ski Area Permits.  (AR 00526.)  The Forest Service reports that thirty-two permits (26%) "do not require any U.S. ownership interest," seventy-nine (65%) have the 2004 Clause, seven (6%) require sole federal ownership, and three (2.5%) have the 2011 Clause.  (AR 00526.)

The record also demonstrates that there is significant variation in permit terms over time for each ski area, and that all permits in effect at any given time have not had uniform water clauses. (AR 00608-644.)  For example, it appears that the Forest Service has inserted the terms of the 2012 Directive into at least one NSAA-member's Ski Area Permit.  (ECF No. 43-1 ¶ 3.)

**F.     Relevant Constitutional and Legislative Provisions**

The Forest Service's authority to manage lands under its jurisdiction derives from the Property Clause of the United States Constitution.  The Property Clause empowers Congress to "make all needful Rules and Regulations respecting the. . .Property belonging to the United States."  U.S. Const. art. IV, § 3, cl. 2.

One of the first statutes Congress enacted relating to national lands was the Organic Act.  That statute entrusts the Forest Service with authority to "make such rules and regulations" as necessary to regulate the "occupancy and use" of the national forests and to preserve them from destruction.  16 U.S.C. § 551.

Subsequent to the Organic Act, Congress has reiterated the authority of the Forest Service to regulate and condition the use and occupancy of NFS lands.  *See*,

8

*e.g.*, Term Permit Act of 1915, 16 U.S.C. § 497 (authorizing the Secretary of Agriculture to permit use and occupancy of NFS lands "upon such terms and conditions as he may deem proper"); Multiple Use-Sustained Yield Act ("MUSYA"), 16 U.S.C. §§ 528-531 (authorizing the Secretary of Agriculture to develop and administer the surface resources of the national forests to provide for five multiple uses, including "outdoor recreation, "in perpetuity"); see also Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1765.

In 1986, Congress directly addressed the Forest Service's authority to allow development of ski areas on NFS lands.  In the National Forest Ski Area Permit Act of 1986 ("Ski Area Permit Act"), Congress provided that permits are to be issued "subject to such reasonable terms and conditions as the Secretary deems appropriate."   16 U.S.C. § 497b(7).

## G.    Procedural Background

On January 9, 2012, NSAA filed its original Complaint against the United States Forest Service, United States Department of Agriculture, and Harris Sherman, the Under Secretary for Natural Resources and Environment at the Department of Agriculture.  (ECF No. 1.)  The original Complaint sought judicial review of the Forest Service's 2011 Directive.  (*Id.*)

On March 12, 2012, shortly after the Forest Service replaced the 2011 Directive with the 2012 Directive, Plaintiff filed an Amended Complaint seeking judicial review of the 2012 Directive.  (ECF No. 8.)

In its Amended Complaint, Plaintiff seeks the issuance of a nationwide injunction to set aside the 2012 Directive under the Administrative Procedures Act  ("APA"), 5

9

U.S.C. §§ 706(2) *et seq.*  Plaintiff contends that the 2012 Directive is in excess of the

Forest Service's statutory authority, compels an uncompensated taking of private

property, was issued in violation of the Regulatory Flexibility Act ("RFA") 5 U.S.C. §§

603 *et seq.* and was adopted without public notice or an opportunity to comment as

required by both the APA and the National Forest Management Act ("NFMA").  *See* 16

U.S.C. §§  1612 *et seq.*  As to the substantive claims as previously noted, the Court has

exercised it discretion not to address these claims,[7] because the 2012 Directive is being

vacated by the terms of this Order.

Defendants filed the administrative record.  (ECF Nos. 13, 14.)  The parties fully

briefed the issues and the Court held a hearing on November 15, 2012.

## IV. ANALYSIS

### A.    Standing

Standing under Article III of the Constitution requires:  (1) an "injury in fact" that is

"concrete and particularized"; (2) a "causal connection between the injury and the

conduct complained of"; and (3) a likelihood that the injury will be redressed by a

favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Kerr v.*

*Hickenlooper*, No. 11-cv-01350, 2012 WL 3089865 July 30, 2012 (D. Colo., July 30,

2012).

Defendants argue that Plaintiff lacks standing to pursue its procedural claims

under the APA and NFMA. [8] (ECF No. 37 at 16-19.)   Defendants rely on the harmless

---

[7] Plaintiff's substantive claims include claims that: (a) the 2012 Directive is Arbitrary and Capricious (b) Defendants Lack Statutory Authority to Issue the 2012 Directive, among others.

[8]  Defendants do not challenge standing under Plaintiff's RFA claim.  (ECF No. 37 at 16-19.)

error doctrine.  Defendants contend that Plaintiff did not suffer injury because—to the

extent that the Forest Service did not meet APA requirements in form—it did so in

substance, and thus harmless error applies. *Id.*

Here, the Court finds that Plaintiff has Article III standing on its procedural APA

and NFMA claims. The harmless error doctrine that Defendants assert is narrow and

applies to technical or minor procedural violations, not total failures to comply with

important rule-making processes.  *See, e.g.*, *Riverbend Farms, Inc. v. Madigan*, 958

F.2d 1479, 1487 (9th Cir. 1992) ("we must exercise great caution in applying the

harmless error rule in the administrative rule-making context. . .if the harmless error rule

were to look solely to result, an agency could always claim that it would have adopted

the same rule even if it had complied with the APA procedures."); *U.S. Steel Corp. v.

E.P.A.*, 595 F.2d 207, 215 (D.C. Cir. 1979).

Defendants argue, however, that they provided NSAA with *input* opportunities

that went "far beyond" what the APA requires because the Forest Service met with

NSAA, e-mailed with NSAA, and provided NSAA with an early draft of its proposed 2011

Directive.  (ECF 37 at 18.)  But, as the record demonstrates, the ability to communicate

informally with an agency does not lawfully substitute for what the APA requires.  The

injuries incurred by the Plaintiff—and the relevant sections of the record—are well

summarized as follows:

1.   *No Statement of Legal Basis:*  The Forest Service never stated the
     legal authority under which the directives were proposed, as
     required by the APA.  (ECF No. 39-12  ¶ 7); 5 U.S.C. § 553 (b).

2.   *No Explanation or Adoption of Rulemaking Process:*  The Forest
     Service failed to provide notice of the "time, place, and nature of
     public rule making proceedings."  5 U.S.C. § 553(b).  The Forest

11

Service did not provide a timeframe for submitting public comments because it never developed an actual rulemaking process.  (ECF No. 39-12 ¶ 6.)  Instead, it allowed NSAA to communicate with it on shifting terms that the Forest Service controlled.  (ECF No. 30-12 ¶ ¶ 5;  ¶ 9  (Forest Service willing to discuss only "broad concepts").)

3.   *No Notice of What the Forest Service Proposed:*  While the Forest Service did meet with NSAA to discuss water rights issues generally, and provided NSAA with draft language at a meeting in September 2011, it did not provide NSAA with a formal explanation of the "terms or substance of the proposed rule" as required by the APA.  5 U.S.C. § 553(b).  The Forest Service never said whether the draft language was a fully formed proposal or simply an interim draft.  (ECF No. 39-12 ¶ 7.)  And the Forest Service gave no notice about fundamental changes made in the 2012 Directive, such as the addition of a loophole that allows the Forest Service to sever water from a ski area to meet "legal requirements."  (ECF No. 39-12 ¶ 13; AR 00027, F.2.a(3); F.b(1); F.b(2).)

4.   *No Explanation of Rule Adopted:*  The Forest Service did not provide the required "statement of the basis and purpose of the rule, which needs to take account of the major comments-and often is a major focus of judicial review."

(*See*, Plaintiff's Facts and Conclusions, ECF No. 58 at 19-20.)[9]

In light of the above, the harmless error doctrine is especially inappropriate where, as here, the rule in question involves complex matters,[10] and procedural injuries to Plaintiff exist.  This is amply demonstrated in the record and supported by substantial evidence.  *United States v. Johnson*, 632 F.3d 912, 932 (5th Cir. 2011); *Olenhouse* 42 F.3d at 1564.

---

[9] Courts have rejected Defendants' contention that an agency may substitute an alternate process for the notice-and-comment rule-making procedures prescribed by the APA. *Sugar Cane Growers Co-op. of Florida v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002).

[10] The 2012 Directive is complex.  (ECF No. 15-1.)  Its precise effect depends on the classes of water rights held and when those rights were acquired, among other things (ECF No. 15 at 15-18 (describing effect of 2012 Directive); ECF No. 15-1.)

Article III standing also requires causation, which is easily satisfied here because Plaintiff NSAA was harmed by the Defendants' conduct (or lack thereof).   Under the APA, Defendants must give public notice of the proposed rulemaking, among other procedures. *See*, 5 U.S.C. § 553(b); 5 U.S.C. § 553(c).   None of that happened here because the procedures afforded to NSAA were deficient and the procedures afforded to NSAA members and the public were nonexistent. This is also admitted by Defendants, which furthers Plaintiff's position.[11]

Defendants finally argue that Plaintiff cannot demonstrate that its procedural injury is redressable because it cannot show how it could have commented differently had Defendants fully complied with the APA.  (ECF No. 37 at 16-19.).

This argument is rejected for two reasons: (1) the APA deficiencies going to "legal basis" are, *inter alia*, significant.  (ECF 39-12  ¶ 7)  Had Defendants complied with this requirement, Plaintiff would have been able to comment on the 2012 Directive far more effectively; and (2) the normal redressability requirement does not apply in cases such as the instant one where Plaintiff seeks to enforce procedural rights under the APA and NFMA.  Parties seeking to enforce procedural rights need not show that they face imminent harm.  *Lujan*, 504 U.S. at 573 n.7  ("There is much truth to the assertion that 'procedural rights' are special:  the person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability or immediacy.")  Additionally, it is abundantly clear that the

---

[11] Defendants admit that they did not follow the APA procedures in adopting the 2012 Directive. *See* ECF No. 9 Defs.' Ans. ¶ 89 ("Defendants admit that the 2012 ski area water rights clause was not published for public notice and comment and deny such publication was required. Defendants deny the remaining allegations in paragraph 89, *i.e* that the Forest Service did not provide a reasoned explanation of the 2012 Directive after it was issued."

relief sought by Plaintiff seeks to redress NSAA's alleged procedural injuries under the APA and NFMA claims.  Defendants do not challenge NSAA's organizational or prudential standing at all, and do not challenge NSAA's Article III standing as to NSAA's non-procedural claims.

In sum, the Court finds that Plaintiff has standing to sue under Article III of the Constitution.

**B.    Merits**

The Court now turns to the merits of Plaintiff's administrative appeal.

1.    Standard of Review

The APA requires that the Court "shall set aside agency action. . .found to be. . . arbitrary, capricious, an abuse of discretion … in excess of statutory authority. . .[or] without observance of procedure required by law." *See*  5 U.S.C. §§ 706(2)(A), (B), (C), (D).  Judicial review of agency action in district courts must be processed as an appeal. *Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1580 (10th Cir. 1994).*  In such circumstances, the "district court should govern itself by referring to the Federal Rules of Appellate Procedure."  *Id.* at 1580.  A district court does not find facts, but rather must determine solely whether "substantial evidence" in the administrative record submitted by the agency supports the decision made.  *Id.* at 1575.

2.    Merits of the Procedural Claim under the APA

The APA requires agencies to adhere to three steps when they promulgate rules: (1) give notice of the proposed rulemaking in the Federal Register; (2) afford interested persons an opportunity to participate through submission of written data, views, or arguments; and (3) explain the rule ultimately adopted.  *See* 5 U.S.C. § 553(b)-(c).  The

14

*exception* to this statutory command is where agencies adopt "interpretive rules, general statements of policy, or rules of agency organization." 5 U.S.C. § 553(b).

The distinction between those agency pronouncements subject to APA notice-and-comment requirements and those that are exempt has been aptly described as "enshrouded in considerable smog," *General Motors Corporation v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (*en banc*). It appears, however, that courts are generally in agreement that only "legislative" rules require public notice-and-comment; whereas "interpretive rules" do not. *See* 5 U.S.C. § 553(b)(3)(A),(d); *Sorenson Communications v. F.C.C.*, 567 F.3d 1215, 1222-23 (10th Cir. 2009). Legislative rules create "new rights," "duties" and, "obligations." *See Morton v. Ruiz*, 415 U.S. 199, 232 (1974); *Ballesteros v. Ashcroft*, 452 F.3d 1153, 1158 (10th Cir. 2006); *Sorenson,* 567 F.3d at 1222 (stating that legislative rules carry the full force and effect of the law).

Interpretive rules merely explain, but do not alter, the substantive law that already exists in the form of a statute or regulation. *Rocky Mountain Helicopters*, 971 F.2d at 546-47 (stating that an interpretive rule "attempts to clarify an existing rule but does not change existing law or policy"). "If a challenged agency action creates a 'legislative rule,' then full compliance with the APA's [processes] is required." *Ballesteros* 452 F.3d at 1158.

From the substantial weight of the evidence, the Court has little difficulty in concluding that Plaintiff must prevail on its APA claim. This is because the 2012 Directive is a legislative rule, and as such was issued in violation of notice-and-comment processes.[12] The reasons are three-fold.

---

[12] *See* Section IV.A. of this Order for a detailed summary of the APA violations.

First, the 2012 Directive is legislative as it carries the full "force and effect of law". *Chrysler v. Brown*, 441 U.S. 281, 295 (1979).  Specifically, the 2012 Directive creates binding legal obligations that are inserted by line officers into ski area permits to include the terms of the 2012 Directive.  (ECF 15-1 at 3.)  This occurs when the permits are "reissued or modified under 36 C.F.R. § 251.61." (*Id.*)  Line officers have no discretion over the terms of the 2012 Directive. (*Id.*)   These terms—such as the Waiver Clause—impose obligations on NSAA members, making them legislative for the purposes of the APA claim.  As such, the Forest Service cannot have it both ways. It cannot seek to have the 2012 Directive inserted into new ski permits (having binding effect, as would a legislative rule); and then contend that the 2012 Directive is only interpretive (non-binding), so to be exempt from notice-and-comment requirements.

Second, the 2012 Directive is not interpretive.  Contrary to Defendant's position, the 2012 Directive does not clarify existing policy—it creates it.  (ECF No. 37 at 20-25.) When asked by the Court to address this argument, Defendants' Counsel resiled from its previous position:[13]

> THE COURT:   My question to you is how could waiver, a mandatory **waiver of a constitutional right** not rise to the level of being something to which the APA [notice-and-comment requirements], apply?
>
> COUNSEL:  I think, your Honor, in this case these terms are—if the Court finds that they are deviations from the past history, significant deviations, then they do have **force and effect of law, so they are in that sense obligatory**. I think then the question becomes to the Court does that mean the entire regulation has to go back for public notice and comment or do you have to get the public notice and comment on

---

[13] Defendants had asserted that the clauses in the 2012 Directive are not obligatory because the clauses only clarify what has always been Forest Service policy.  (ECF No. 37 at 20-21.)

these particular provisions.  So I guess then it comes down a question of remedy. . .can you excise particular provisions and leave the clause in effect?

THE COURT:  I think that's a valid question, but it's not just the power of attorney and waiver clauses. I am really glad now that we asked you to do this comparing and contrasting, because it's not just that that's different.[14]

While the response above was qualified, Counsel's answer confirms that clauses in the 2012 Directive are legislative.  That is, the clauses *do* impose new rights and obligations.  Defendants' Counsel could point to no prior water clause that compels permit holders to waive Constitutional rights as to compensation.  (AR 00032 at ¶ F.2.f; AR 00068-70, 639-642.)  Nor could counsel point to any prior clause compelling permit holders to grant the United States a power of attorney for the purposes of transferring water rights to itself.  (AR 00031 at ¶ F.2.e; AR 00639-642.)  These are just two clauses in the 2012 Directive, among others, that cut against Defendants' position.  Because these clauses impose new rights and obligations, the rule is legislative requiring notice-and-comment compliance under the APA.  Indeed the fact that Defendants admitted that they did not follow APA procedures only reinforces the result against them.[15]  *See Morton,* 415 U.S. at 232; 5 U.S.C. § 553(b)-(c).

Third, and as a related matter, there is nothing in the Ski Area Permit Act (or any other statute) that the power of attorney clause, *inter alia*, specifically interprets for the

---

[14] The Court found, *inter alia*, the requested documents comparing the 2004 Clause and the 2012 Clause of much assistance in determining the parties' positions. (*See* ECF No. 51, Exh. 2 and ECF No. 52 Exh. 2.)  Indeed these documents lifted much of the smog to allow the Court better determine whether the 2012 Directive imposed obligations on NSAA members for the purposes of determining the legislative-interpretive dichotomy.

[15] Defendants admit, in part, that they did not follow the APA procedures in adopting the 2012 Directive. *See* ECF No.9 ¶ 89 ("Defendants admit that the 2012 ski area water rights clause was not published for public notice and comment and deny such publication was required.")

purposes of the APA procedural claim.[16]  (AR 00031-32, ¶ F.2.e.)  That clause is a new

rule; a legislative rule.  Defendant cannot credibly contend that the power of attorney

'interprets' existing Forest Service policy in order to escape notice-and-comment

requirements. *Sorenson* 567 F.3d at 1222-23.[17]

This view is also supported by *Mission Group Kansas, Inc. v. Riley*, 146 F.3d

775, 777 (10th Cir. 1998).[18]  There, the Secretary of Education adopted the "85/15 rule"

for federal education funding without following APA procedures.  The agency argued

that the 85/15 rule was interpretive because it interpreted a statutory mandate to

"'establish[] reasonable standards of financial responsibility for … eligible institutions.'"

*Id.* at 779. The Tenth Circuit rejected the agency's argument, stating:

> [W]hen a statute does not impose a duty on the persons subject to it but
> instead authorizes. . .an agency to **impose a duty**, the formulation of that
> **duty becomes a legislative task** entrusted to the **agency**. . .[Such] a rule
> would be the clearest possible example of a legislative rule, as to which
> the notice-and-comment procedure. . .is mandatory. (emphasis added.)

*Id.* at 784.

Here, and like the 85/15 rule in *Mission Group*, the 2012 Directive is "the clearest

possible example of a legislative rule" because it is intended to impose new duties,

---

[16] The Court notes that this view, on the APA procedural claim, does not shape the Court's view on the substantive claims, which the Court declines to address at this time.

[17] Indeed, Defendants' Proposed Facts and Conclusions of Law seek, in the alternative, to vacate the Power of Attorney Clause from the 2012 Directive if the Court were to find for Plaintiff on the procedural claims. (ECF No. 57 at 50.)  This argument is not inconsistent with what was also said during the hearing by Defendants' Counsel "regarding excise particular provisions" of the 2012 Directive.  The Court rejects that view.  See *infra* notes 4 and 18-19.

[18] The parties were expressly required to address this case because the statutes and facts were similar to those in suit.  (ECF No. 50.)  Upon review of Defendants' Proposed Facts and Conclusions of Law, nowhere does the Forest Service squarely address *Mission Group.* This cuts against Defendants' position. *See Phillips v. Calhoun*, 956 F.2d 949, 953-54 (10th Cir. 1992) (stating that "a litigant who fails to press a point . . .in the face of contrary authority, forfeits the point.")

rights, and obligations on permit holders.  The Power of Attorney and Waiver Clauses

are illustrative—making the 2012 Directive a legislative rule.[19]   *See Mission Group*, 146

F.3d at 784  ("When agencies base rules on arbitrary choices they are legislating, and

so these rules are legislative and require notice and comment rule-making.")[20]

Accordingly, the Court concludes the 2012 Directive is: (1) a legislative rule and

(2) procedurally invalid given that Defendants did not follow the requisite APA

procedures when they adopted it.

3.     Merits of the Procedural Claim under the RFA

The RFA requires that agencies consider the economic impacts to small

businesses of new rules that are subject to APA compliance. 5 U.S.C. § 553; 603(a).

_____

[19] Defendants' Counsel indicated that the Waiver and Power of Attorney clauses could be excised from the 2012 Directive.  The Court disagrees.  The Court finds that the clauses in the 2012 Directive are so interrelated that excising the Power of Attorney clause would usurp the purpose of the 2012 Directive. Defendants' fall-back position is rejected.

[20] Defendants cite statutes that authorize the Forest Service to adopt conditions for the use and occupancy of federal lands.  (ECF No. 37 at 3.) Specifically, Defendants state in their Response:

"In 1986, Congress directly addressed the Forest Service's authority to permit development of ski areas on NFS lands. In the National Forest Ski Area Permit Act of 1986 ("Ski Area Permit Act"), 16 U.S.C. § 497b, Congress explicitly provided that permits are to be issued 'subject to such reasonable terms and conditions as the Secretary deems appropriate.' 16 U.S.C. § 497b(7)."

*Id.* In the Court's view, such broad language does not assist the Defendants on the APA procedural claim.  While argument may exist that the Ski Permit Area Act might possibly authorize the Forest Service to "impose these duties", Defendant can only (at best) argue that this allows for a delegation of power to make a "legislative rule", as to which 'notice-and-comment procedure' are mandated by *Mission Group* 146 F.3d at 784; (see also Plaintiff's Proposed Facts and Conclusions of Law, ECF No. 57 at 50, stating "the only possible authority [for Defendants] contains only a delegation to legislate.") And that argument is made before the Court even determines the substantive merits.  But that is not how Defendants have put their case. Defendants have argued the interpretive rule exception, and therefore sought to be exempt from APA compliance.  The Court rejects position for the reasons stated above and *reserves* any view on the *substantive claims. Id. (*emphasis added*.)

The RFA "obliges federal agencies to assess the impact of their regulations on small businesses." *U.S. Cellular Corp. v. F.C.C.*, 254 F.3d 78, 88 (D.C. Cir. 2001).

Pursuant to the RFA, agencies must notify and make available for public comment an initial regulatory flexibility analysis ("Initial RFA").  5 U.S.C. § 603(a). Agencies must use statutorily-prescribed elements that describe the impact of the action on small businesses. *Id.*  When an agency promulgates a final rule, it must prepare a final regulatory flexibility analysis ("Final RFA"), also using specific, statutorily-prescribed elements.  i § 604(a). These, too, must be made available to the public and published in the Federal Register. *Id.* § 604(b).  Importantly, the agency must provide an opportunity for small entities to participate in the rule-making process.  *Id.* § 609(a).   A ski area that has less than $7 million in annual receipts averaged over three years is a "small entity" within the meaning of the RFA.  *See* 5 U.S.C. §§ 601(6), 601(3); 15 U.S.C. § 632; 13 C.F.R. §§ 121.104, 121.201.[21]  Here, several NSAA members—such as Sipapu in New Mexico and Showdown in Montana—fall within the definition of small entity.  (ECF No. 15-9 ¶ 11, ECF No. 15-11 ¶ 2.)

Because the Forest Service admits that it did not assess whether the 2012 Directive would have a significant economic impact on these entities, the Court finds

---

[21] In *U.S. Telecom Association v. F.C.C.*, 400 F.3d 29, 42 (D.C. Cir. 2005), the D.C. Circuit considered a case where the Federal Communication Commission failed to follow the RFA when it published an order.  The court noted that:

> Nor is there an argument that the Commission's failure was harmless, as it is impossible to determine whether a final regulatory flexibility analysis— which must include an explanation for the rejection of alternatives designed to minimize significant economic impact on small entities—would have affected the final order when it was never prepared in the first place.

*Id.*  The court stayed enforcement of the rule and remanded to the agency.  *Id.* at 43. In the present case, a similar result follows in accordance with the Court's Orders, below.

that the Forest Service has not complied with the RFA.[22]   (ECF No. 9   ¶¶ 63, 107, 108; ECF No. 8   ¶¶ 107, 108.)   Specifically, the Forest Service did not evaluate the effect of compelling NSAA members—like Sipapu and Showdown—to assign their water rights to the Forest Service without compensation.   Nor did the Forest Service prepare an Initial RFA or Final RFA, which constitute further violations of the statute.[23]   (ECF No. 15-9   ¶¶ 9-12, ECF No. 15-11   ¶¶ 9-10.)

        4.   <u>Merits of the Procedural Claim under the NFMA</u>

       Plaintiff asserts that the Forest Service issued the 2012 Directive in violation of the procedural requirements of the NFMA.   (ECF No. 8 at 22-23; ECF No. 15 at 30-32; ECF No. 14-15.)   NFMA mandates that:

> In exercising his authorities under [NFMA] and other laws applicable to the Forest Service, the Secretary, by regulation, shall establish procedures, including public hearings where appropriate, to give the Federal, State, and local governments and the **public adequate notice and an opportunity to comment** upon the formulation of **standards, criteria, and guidelines** applicable to Forest Service programs.

16 U.S.C. § 1612(a).   (emphasis added.)

       The Forest Service regulations define "standards, criteria, and guidelines" as the written policies contained in the *Forest Service Manual*.   36 C.F.R. § 216.2(c).   The regulations exempt materials issued in the *Forest Service Handbook* from NFMA's

---

[22] An agency may avoid the obligations of the RFA if the agency head certifies that the rule will not have a significant impact on a substantial number of small entities.   5 U.S.C. § 605(b).   Nothing in the record indicates that the Chief of the Forest Service did that.

[23] Defendants' argument as to application of the RFA was also bundled into the argument that the RFA does *not* apply to interpretive rules (much like the APA claim).   The Court rejected that argument as to the APA claim; and the reasoning is equally applicable with respect to the RFA claim.   *Cent. Texas Tel. Co-op v. FCC*, 402 F.3d 205, 214 (D.C. Cir. 2005); *Nat'l Ass'n for Home Care v. Shalala*, 135 F. Supp. 2d 161, 165-66 (D.D.C. 2001).

public notice-and-comment requirements.  36 C.F.R. § 216.3(a)(2).  Here, the Forest

Service houses the 2012 Directive in the Forest Service Handbook, not the Manual.

(AR 00024.)  Since the 2012 Directive is housed in the Handbook, Defendant argues

that it is not subject to mandated procedures outlined above.  The Court rejects this

argument.

Contrary to Plaintiff's position, the Court finds that the NFMA procedures apply

because the Forest Service cannot exempt itself by simply housing the 2012 Directive in

its Handbook.[24] Defendants seek to elevate form over substance—particularly when the

2012 Directive is directed towards formulating standards, criteria, and guidelines for the

issuance of ski permits regulated by the Forest Service employees.[25]  See 36 C.F.R. §

216.2(c).

The Court's holding is supported by *Back Country Horsemen of America v.*

*Johanns*, 424 F. Supp. 2d 89, 95 (D.D.C. 2006).  There, the defendant asserted that it

had no obligation under 16 U.S.C. § 1612(a) to provide public notice and comment

before adopting binding directives because it published the directives in its handbook.

The court rejected that argument.  The court ruled, that as the policy was intended to

"guide the trail manager's decision-making process,"  the agency's action fell within the

ambit of "written policies, instructions or orders".  *Id.*  This, the court said, established the

general "framework for the management and conduct of Forest Service programs."  *Id.*

---

[24] *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 322-23 (D.C.Cir.1987) (stating that, at a minimum, an agency cannot use its regulations to "avoid statutorily mandated notice and comment procedures.")

[25] Line officers of the Forest Service must insert the terms of the 2012 Directive into ski area permits when the permits are "reissued." 36 C.F.R. § 251.61."  (ECF No. 15-1 at 3.)

22

at 97. Therefore, the court held that the agency's action constituted the formulation of standards and guidelines applicable within the meaning of 16 U.S.C. § 1612(a). *Back Country Horsemen of America*, 424 F.Supp 2d at 96.

Similarly, here, the Court holds that the 2012 Directive falls within the meaning of NFMA.  Like the trail policy in *Backcountry Horsemen*, the 2012 Directive establishes binding legal terms for implementing Defendants' ski area water rights policy. (ECF No. 37 at 14.)  It is a "general framework" for a Forest Service "program" and Defendants' adoption of it—without the procedures guaranteed by 16 U.S.C. § 1612(a)—violates the NFMA.[26] *Backcountry Horsemen* 424 F. Supp. 2d at 97.

Accordingly, Plaintiff's procedural claim under the NFMA prevails because (1) the NFMA applies to the 2012 Directive and (2) that the Forest Service violated its requirements under that statute.[27]  16 U.S.C. § 1612(a).

---

[26]   Given this Court's holding that the 2012 Directive is a legislative rule, it would be difficult to find a circumstance where the NFMA public notice requirements are not triggered where APA compliance also applies (as in this case).  Specifically, since the 2012 Directive imposes new duties and obligations, it follows that the imposition of these duties and obligations constitutes "the formulation of standards, criteria, and guidelines" within the meaning of the NFMA 16 U.S.C. § 1612(a).  If anything, the language used in the NFMA ("standards, criteria and guidelines") appears to be broader than the "legislative rule" requirement under the APA. As will be addressed later, the cumulative impact of the APA, NFMA and RFA violations dovetail with the relief granted in this Order, herein.

[27] It is noted Forest Service regulation 36 C.F.R. § 216.3(a)(1) "exclude[s] from the NFMA notice-and-comment requirements rules promulgated under the APA."  Contrary to Defendants' position, the regulation does not exempt legislative rules such as the 2012 Directive that did not go through APA notice and comment.  Here, the 2012 Directive is legislative, but did not go through APA requirements, thus the NFMA requirements apply until the APA steps have been satisfied.

## V. REMEDIAL RELIEF

Plaintiff NSAA seeks relief from Defendants' action pursuant to the APA.  The

judicial review provision of the APA provides that courts "shall. . .hold unlawful and set

aside agency action. . .found to be. . .arbitrary, capricious, . . .in excess of statutory. . .

authority. . . [and adopted] without observance of procedure required by law."  5 U.S.C.

§ 706(2); *see also Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1240

(D. Colo. 2011) (holding that "reviewing courts are directed to summarily set-aside

agency action found to be arbitrary, capricious. . .or otherwise not in accordance with

law.")

As a matter of equitable jurisdiction, this Court retains its full equitable authority

to craft the appropriate remedy.  5 U.S.C. § 702 ("[n]othing herein . . . affects . . . the

power or duty of the court to dismiss any action or deny any relief on any other

appropriate legal or equitable ground.")  The lack of an express jurisdictional limitation is

significant because absent an express congressional mandate to the contrary, courts

retain traditional equitable discretion.[28] *Weinberger v. Romero-Barcelo*, 456 U.S. 305,

320, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) ("[A] major departure from the long tradition

of equity practice should not be lightly implied."); *see also* U.S. Const. art. III § 2.

("[J]udicial power shall extend to all Cases in Law *and Equity*. . ." (emphasis added).[29]

---

[28]  Upon consideration of the equities, federal courts have the discretion to determine
that equitable relief should or should not issue despite a legal violation.  See, e.g.*, Winter v.
Natural Res. Def. Council*, 555 U.S. 7, 23 (2008).

[29] By anchoring equitable power in the text of Article III, the Framers insulated, to an
extent, the federal courts' equitable powers from Executive and Congressional incursion.
Rather than maintaining equity in the sovereign (the Executive) as had England—or in populist
"colonial assemblies and legislatures" pre-independence—the Framers shifted equitable
jurisdiction to pure a judicial construct under Article III of the Constitution. *See Plaut v.
Spendthrift Farm, Inc.*, 514 U.S. 211, 218-220 (1995); *see also* G. Wood, *The Creation of the*

A.      **Vacatur**

"Vacatur is an equitable remedy. . .and the decision whether to grant vacatur is entrusted to the district court's discretion." *Rio Grande Silvery Minnow v. Bur. of Reclamation*, 601 F.3d 1096, 1139 (10th Cir. 2010).  Vacation of an agency action "without an express determination on the merits is well within the bounds of traditional equity jurisdiction."  *See Ctr. for Native Ecosystems,* 795 F. Supp. 2d at 1240;[30] *Natural Res. Def. Council (NRDC) v. United States Dep't of the Interior*, 275 F. Supp. 2d 1136, 1144 (C.D. Cal. 2002) ("The procedural or substantive nature of the error causing a rule to violate the APA does not itself limit the court's equitable powers to enforce a regulation during a remand period.")

To determine whether an order to vacate is warranted, courts consider a two-part test.  *Allied-Signal, Inc. v. NRC*, 988 F.2d 146 (D.C. Cir. 1993); *see also United Mine Workers v. Dole*, 870 F.2d 662, 673 (D.C. Cir. 1993).  Both those cases were cited and applied by Judge John L. Kane of this District Court in *Ctr. for Native Ecosystems,* 795 F. Supp. 2d at 1240.  There, Judge Kane held that because vacatur is an equitable remedy—and since the APA does not expressly preclude the exercise of equitable jurisdiction—the "APA does not preclude the granting of vacatur without a decision on the merits." *Id.*  In applying its equitable discretion, the court stated that it must consider: (1) "the seriousness of the deficiencies in the completed rule-making and the doubts the deficiencies raise about whether the agency chose properly from the various

_____

*American Republic* 1776-1787, pp. 154-155 (1969).

[30] *See also Coal. of Ariz./N.M. Cntys. for Stable Econ. Growth v. Salazar*, No. 07-cv-00876 (D.N.M. May 4, 2009) (Dkt. No. 51 at 5) given the dearth of case law on this issue.

alternatives open to it in light of statutory objectives," which is in turn weighed against

(2) any harm that "might arise from vacating the existing rule, including the potential

disruptive consequences of an interim change." *Id* at 1240.  As discussed below, the

Court finds that these factors ultimately weigh in favor of vacating the 2012 Directive.

     1.   Seriousness of Defendants' Deficiencies

     In exercising equitable discretion, the Court turns to Defendants' procedural

deficiencies.  First, there have been significant violations of the APA by Defendants in

promulgating the 2012 Directive.[31]  These violations have been addressed earlier.  In

the Court's view, these deficiencies by Defendants are severe, which cut heavily in

Plaintiff's favor.

     Second, the Forest Service, *inter alia*, did not evaluate the economic impact on

small business entities when the 2012 Directive was being developed.  (ECF No. 15-9

¶¶ 9-12, ECF No. 15-11 ¶¶ 9-10.)  Among other things, these requirements of the RFA

are intended to ensure that small entities have an opportunity to participate in the rule-

making process.  *Id.* § 609(a). Third, like it did with respect to the requirements of the

APA, the Forest Service also failed to comply with notice-and-comment procedures

guaranteed under the NFMA. 16 U.S.C. § 1612(a); (ECF No. 37 at 14.) [32]

---

[31]  The fact that the 2012 Directive is a complex document only magnifies the severity of the APA deficiencies.  The Power of Attorney Clause is illustrative. (AR 00031; ECF No. 15, Exh. 1 ¶ F.2.e.).

[32]  The Court notes that, in Defendants' Proposed Facts and Conclusions of Law, they do not meaningfully address whether the "deficiencies raise [doubts] about whether the agency chose properly from the various alternatives open to it in light of statutory objectives." *Ctr. for Native Ecosystems,* 795 F. Supp. 2d at 1240.  Here, Defendants have not so much chosen proper alternatives to circumvent the rule-making process in light of statutory objectives, but have instead ignored the procedural requirements of the APA, RFA, and the NFMA altogether. That, it seems, was a strategic choice by the Forest Service, which it then sought to defend by arguing here that the 2012 Directive was "interpretive" (not legislative) or that arguments of

On this record, the Court has little difficulty concluding that the APA procedural violations are serious deficiencies on the part of Defendants.[33]  These deficiencies, alone, would be enough to warrant the relief on the first part of the test—particularly where the deficiencies are admitted by Defendants. The fact that substantial evidence shows that Defendants also violated the RFA and NFMA only serves to reinforce the result against Defendants on vacatur.

2.     The Potential For Disruptive Consequences

The Court must also consider whether vacating the 2012 Directive will lead to disruptive consequences.  *Ctr. For Native Ecosystems*, 795 F. Supp. 2d at 1242.  the Court finds it will not.  The record indicates that the 2012 Directive has to date only been inserted into one permit.  (ECF No. 15-1 ¶ 3.)

The Forest Service argues that "[v]acating the 2012 Clause. . . creates uncertainty as to the terms to be included in ski area permits and would result in considerable disruption of the ski program, likely delaying issuance of any permits while the Agency completes a new clause."  (ECF No. 37 at 45.)  But the burden is on the Forest Service to put forth a factual basis, and not just conclusory policy statements, for any "disruptive consequences" that it alleges could result.  *See, e.g., Building Indus. Legal Defense Found. v. Norton*, 231 F. Supp. 2d 100, 105-06 (D.D.C. 2002) ("the Court cannot rely upon. . . abstract policy arguments; rather there must be some factual basis

---

"form over substance" apply to the NFMA claim. These arguments have been rejected by the Court, above.  As a result, Defendants have *not* put forward persuasive arguments going to this aspect of the vacatur test.   *See also  Meyer v. Bd. of County Comm'rs*, 482 F.3d 1232, 1242 (10th Cir. 2007) ("[W]e are not charged with making the parties' arguments for them." )

[33] Defendants seek to rely on *Back Country Horsemen of America,* 424 F. Supp. 2d at 89.  But in that case there were not the same number of violations as we have here.

for determining what the disruptive consequences might be."")[34]

Here, vacating the 2012 Directive will simply eliminate a national rule that directs line officers to insert procedurally invalid water clauses into Ski Area Permits.  The Court concludes that any disruptive effect would be minimal—particularly where the Forest Service admits it operated for decades without a national directive regarding ski area water rights. (ECF No. 37 at 6.)

In sum, the Court finds that the equities favor Plaintiff NSAA.  Because of the severity of Defendants' many procedural violations—coupled with the complexity of the 2012 Directive and its impact spanning 13 states—the Court grants vacatur of the 2012 Directive.

**B.     Injunctive Relief**

In addition to vacatur, Plaintiff seeks to enjoin enforcement of the 2011 and 2012 Directives that are included in existing Ski Area Permits.[35]

Specifically, as to the 2011 Directive, Plaintiff seeks to enjoin the Forest Service from enforcing the terms of the 2011 Directive that the Forest Service inserted into Ski Area Permits.  Plaintiff argues that injunctive relief is necessary because such terms

---

[34] In *Building Industries.* 231 F. Supp. 2d 100, 109, Fn.6, the Intervenors even submitted declarations that noted the needs of the species which would not be compromised by vacatur. In this case, Defendants do not even offer declarations in their Proposed Facts and Conclusions of Law.

[35] The Court does exercise injunctive relief lightly. The relief it is ordering here has been narrowly tailored to "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  See *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  The relevant permit holders are small in number and are similarly situated.  To date, the Court is unaware of any further permit holders whose ski permits contain procedurally invalid 2011 and 2012 Directives; however, relief has been granted to accommodate for this until there is APA compliance and parties seek lifting of the injunctive relief.

have been inserted into at least three Ski Area Permits.  (ECF No. 15-5 ¶ 18.)[36]  As to

the 2012 Directive, Plaintiff argues that injunctive relief is necessary because the Forest

Service has inserted the terms of the 2012 Directive into at least one Ski Area Permit.

(ECF No. 49-1 ¶ 3.)   Plaintiff contends that there is nothing to stop enforcement of

these terms other than Defendants' discretion not to do so.[37]  Finally, Plaintiff asks that

the Court enjoin the Forest Service from inserting the text of the 2012 Directive into

additional ski area special use permits.   In effect, Plaintiff seeks relief that it contends is

necessary to fulfil the intent of the order to vacate.  The Court agrees.  The Court finds

that the injunctive relief is particularly necessary to ensure good faith between the

parties while the 2012 Directive runs through APA procedural process on remand.

The Court notes that the remedial analysis—as to the class of permit holders

described above—will be addressed collectively because enforcement of procedurally

invalid 2011-2012 clauses constitutes common injuries to each.

1.   Injunctive Relief: the *Monsanto* Factors

Plaintiff contends that the Court may enter injunctive relief in addition to vacating

the 2012 Directive if vacatur is not sufficient to remedy NSAA members' injuries.  *See,*

*e.g., Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2761 (2010) (stating "[i]f

a less drastic remedy—such as partial or complete vacatur of an [agency] deregulation

decision, was sufficient to redress respondents' injury—no recourse to the additional

---

[36] The Court notes, though, that the 2011 Directive is substantively the same as the 2012 Directive. (Compare AR 00036-44 with AR 00024-32.)

[37]  The lack of an express jurisdictional limitation is significant because it maintains a court's broad equitable powers to tailor effective relief. *Weinberger* 456 U.S. at 320.

and extraordinary relief of an injunction was warranted.");[38] *Colo. Envt'l Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1223 (D. Colo. 2011) (entering injunction prohibiting issuance of additional uranium leases to remedy harm caused by NEPA violation).

Injunctive relief rests within the equitable discretion of district courts. *eBay v. MercExchange*, 547 U.S. 388, 391 (2006). To determine whether to grant injunctive relief, courts apply a four-factor test:

> "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."

*Monsanto*, 130 S. Ct. at 2756 (quoting *eBay*, 547 U.S. 388, 391 (2006)); see also *Colo. Envt'l Coal.,* 819 F. Supp. 2d at 1223 (applying the "traditional four-factor test" for permanent injunctions).

The *first factor* for injunctive relief—irreparable injury[39]—has been amply

---

[38] The Court finds *Monsanto* distinct from the present case in so far as the district court in that case was "enjoining" the partial deregulation of a decision by the Animal and Plant Health Inspection Service (APHIS) to deregulate a variety of genetically engineered alfalfa. Here, the relief is far more narrow. It applies to only four permit holders (and any other permit holder where the 2011-2012 Directive has been inserted into a Ski Area Permit). Moreover, while the injunction does prevent enforcement of a legislative rule, it does not go to the same length as the district court in *Monsanto*—which sought to provide injunctive relief requiring APHIS to maintain a legislative rule. The relief, here, simply seeks to stop the enforcement of a legislative rule that this Court has found procedurally invalid and which, in part, Defendants operated without for many years. The distinction is nuanced, but significant in taking this case outside the ambit of *Monsanto*.

[39] Defendants' contend that NSAA has not identified a single instance in which the terms of the 2011 and 2012 Clauses have been enforced in a manner causing a permittee irreparable injury. But the purpose of injunctive relief is to prevent injury from occurring. The relief, here, seeks to prevent the Forest Service from enforcing the clauses in the 2012 Directive where

demonstrated here. Irreparable injury often derives from the nature of the violation.

While a procedural violation alone may not establish irreparable injury, it is a relevant

factor to consider—particularly, as here, where rights have been violated under three

separate statues. *See, e.g.*, *Brady Campaign to Prevent Gun Violence v. Salazar*, 612

F.Supp.2d 1, 24 (D.D.C. 2009) (stating that "a procedural violation of NEPA is. . . a

relevant consideration" for determining irreparable injury.)  In considering this factor, the

procedurally invalid clauses in the 2012 Directive provide the relevant predicate for the

analysis. In *Colorado Environmental Coalition*, this Court found that the issuance of the

31 leases for uranium mining, in light of the procedural NEPA violations, had tangible

effects so to show irreparable injury. 819 F. Supp. 2d at 1205–06.  The injunctive relief

ordered in that case stayed enforcement of the uranium leases. *Id.*

Here, Plaintiff contends that the four permit holders (and any other future permit

holder where the 2012 Directive has been inserted) will be irreparably injured if the

directives are enforced.  The Court agrees.  The 2012 Directive requires the permanent

transfer of valuable water rights to the federal government.  The application of the

Power of Attorney Clause and the Waiver Clause reinforce this view.  Specifically, in

this case, the clauses in the 2012 Directive were intended to bind permit holders. Those

clauses have been found to be procedurally invalid.  And those permits, with

procedurally invalid clauses (like the uranium leases) have "tangible effects" on permit

holders' rights—*i.e.*, the clauses tangibly effect water rights, among other things.   As

this Court  found irreparable injury in *Colorado Environmental Coalition* because the

---

those clauses already exist in Ski Area Permits and, hence, where some injruy has already
occurred.

issued leases had tangible effects (exploration activities etc); the Court similarly finds that there is irreparable injury in this case for permit holders if the 2012 Directive is enforced as to water rights (at least until APA compliance has been satisfied.)  Given that enforcement of the of the directives by Forest Service employees would have "tangible effects" on the permits that contain the 2011-12 Directives, the Court finds that irreparable injury exists.  *Colorado Environmental Coalition,* 819 F. Supp. 2d at 1224.

As to the *second factor*—the inadequacy of remedies at law—this factor also favors Plaintiff.  First, monetary damages at law will not remedy the four permit holders: the APA does not afford monetary relief.  APA, 5 U.S.C. §§ 701-706.  Second, if the 2012 Directive was enforced by the Forest Service, one of the clauses therein prevents a permit holder from claiming compensation—*i.e.* the Waiver Clause. Enforcement of the 2012 Directive thus precludes money damages being awarded to any of the relevant permit holders (assuming *arguendo* that the Waiver Clause is valid).

Third, Defendants contend that injunctive relief is not warranted because they will not enforce the 2011-2012 Directives if the Court grants vacatur.  And, even if Defendants did enforce those directives, the four permit holders can still challenge the such action based on "ordinary principles of *stare decisis.*"  (ECF No. 57 at 49.) These contentions (in the alternative) lack merit.  Uncertainty of when, and if, the Forest Service attempts to enforce a clause—pursuant to the 2011 or 2012 Directives—is precisely what the injunction seeks to prevent.  Moreover, the injunctive relief in this case will be narrow.  The relief ordered will only enjoin the Forest Service from exercising discretion to enforce clauses in existing permits—an injury that would be irreparable for the four permit holders (and others if the 2011-2012 Directives are

32

inserted into further Ski Area Permits).   As such, this factor weighs heavily in Plaintiff's favor.[40] [41]

As to the third factor, the balance of the hardships favors an injunction.   Here, the requested injunctive relief simply prohibits the Forest Service from enforcing procedurally invalid rules while it reevaluates the 2012 Directive in light of its statutory authority and consistent with its obligations under APA, NFMA, and RFA.   The inconvenience caused by requiring the agency to adhere with statutory requirements and mandatory procedures does not outweigh the very real harm that the 2012 Directive has caused NSAA members.   This factor also weighs heavily in Plaintiff's favor.

And finally, with respect to the fourth factor, the Court concludes that there is public interest in ensuring that federal agencies adhere to rule-making processes in the APA, RFA and NFMA statutes.   The Forest Service adopted the 2012 Directive without involving the public, as required by these statutes.   Requiring the Forest Service to involve the public in important decisions regarding the use and administration of federal lands is in the public interest; ever more so where those lands span 13 states

---

[40]   Moreover, failure to comply with APA rules are difficult to compensate—particularly when the very mischief that the APA seeks to remedy is opaque rule-making. As such, because the procedural injuries are not easily compensated with monetary damages, this factor cuts in Plaintiff's favor.

[41]   Arguments proffered by government defendants that they will not enforce invalid laws have been made in other contexts; and have been rejected.   *United States v. Nosal*, 676 F.3d 854, 860 (9th Cir. 2012). There, the Ninth Circuit rejected the government's argument that it would not enforce the Computer Fraud and Abuse Act  18 U.S.C. § 1030(a)(4).   Specifically, the Ninth Circuit said: "Under the broad interpretation of the CFAA, such minor dalliances would become federal crimes. While it's unlikely that you'll be prosecuted for watching Reason TV on your work computer, *you could be. . .*Ubiquitous, seldom-prosecuted crimes [and civil suits as permitted under the CFAA] invite *arbitrary* and discriminatory enforcement." *Id.*   Accordingly, it is the exercise of this discretion, predicated on a procedurally invalid rule, that the Court's relief seeks to remedy through prophylactic means. *See also,* P. Hoffer, *The Law's Conscience: Equitable Constitutionalism in America*, pp. 8-9 (1990).

nationwide.  (ECF No. 15-5 ¶ 2.)  Accordingly, the public interest would not be disserved by issuance of the injunction.

The Court holds that all of the factors support issuance of the narrow injunctive relief requested.[42]  Indeed, the relief has carefully tailored to "be no more burdensome" to Defendants than "necessary to provide complete relief" to the relevant permit holders. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

## VI. CONCLUSION

Based on the foregoing reasons, the Court ORDERS as follows:

1.   Defendants' process used to adopt the 2012 Directive violated the APA, RFA and NFMA;

2.   Interim Directive 2709.11-2012-2, issued by the United States Forest Service and effective March 6, 2012 ("2012 Directive") is VACATED;

3.   Defendants are ENJOINED, nationwide, from enforcing the terms of the 2012 Directive already included in existing Ski Area Permits;

4.   Defendants are ENJOINED, nationwide, from enforcing the terms of Interim Directive 2709.11-2011-3 already included in existing Ski Area Permits; and

5.   This matter is REMANDED to the United States Forest Service for further action not inconsistent with this Court Order of even date.

---

[42]  The Court notes that the second, third and fourth factors are enough to tip the scales in favor of Plaintiff, particularly given the weight the Court affords each of them.  The first factor does, though, support injunctive relief; just not with the same weight as the others.

Dated this 19th day of December, 2012.

BY THE COURT:

_____
William J. Martínez
United States District Judge